**DIAMOND SHAMROCK CORPORATION, Kerr-McGee Corporation, Texaco Inc., and Exxon Corporation, Plaintiffs,**

v.

**James B. EDWARDS, Secretary of Energy, Defendant.**

Civ. A. No. 81–101.

United States District Court, D. Delaware.

April 7, 1981.

Robert K. Payson of Potter Anderson & Corroon, Wilmington, Del.; Keith A. Jones, Warren Belmar, O. David Stephens and Campbell Killefer of Fulbright & Jaworski, Washington, D. C., John V. Cottle and Jerry D. King, Amarillo, Tex., Richard R. Wilfong and Richard F. Campbell, III, Oklahoma City, Okl., Stephen H. Bard and Elizabeth P. Smith, White Plains, N. Y. and James McAnelly and Edward de la Garza, Houston, Tex., of counsel, for plaintiffs.

James W. Garvin, Jr., U. S. Atty., Peggy Ableman, Asst. U. S. Atty., Wilmington, Del. and Nancy C. Crisman, Thomas H. Kemp, Peter Aron and Robert C. Power, Gen. Counsel, Dept. of Energy, Washington, D. C., for defendant.

Richard Herrmann of Bayard, Brill & Handelman, Wilmington, Del. and Kenneth L. Bachman, Jr. and Eugene M. Goott of Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., of counsel, for amicus curiae Tosco Corp.

## OPINION

LATCHUM, Chief Judge.

Diamond Shamrock Corporation ("Diamond Shamrock"), Kerr-McGee Corporation ("Kerr-McGee"), Texaco, Inc. ("Texaco"), and Exxon Corporation ("Exxon") seek a preliminary injunction ordering the Secretary of the Department of Energy ("DOE") to cease enforcement of the entitlements program set forth at 10 C.F.R. §§ 211.66 and 211.67 and the tertiary incentive program set forth in 10 C.F.R. § 212.78 in any manner that would adversely affect them.[1] Plaintiffs' principal contention is that Executive Order 12287, 46 Fed.Reg. 9909 (Jan. 28, 1981), which, with certain exceptions, exempted all crude oil and refined petroleum products from price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended, also terminated DOE's authority to enforce the challenged regulations and to require transfer payments under them with respect to oil which was sold prior to the issuance of the Order on January 28, 1981. On this and several procedural grounds, plaintiffs therefore seek to prevent DOE from issuing "entitlements" based upon crude oil purchases which took place in December, 1980, and January, 1981, and to block any "recertifications" under the tertiary incentive program of crude oil sold before January 28, 1981. Plaintiffs contend that without relief *pendente lite* they will suffer irreparable harm because they will be required to make "wide distribution of

---

1. Docket Item ("D.I.") 2. Jurisdiction over this action seeking declaratory and injunctive relief exists by virtue of 28 U.S.C. §§ 1331, 1337, 1361, and 2201; § 502 of the Department of Energy Organization Act ("DOE Act"), 42 U.S.C. § 7192; § 523(b) of the Energy Policy and Conservation Act, as amended, 42 U.S.C. § 6393(b); § 5(a)(1) of the Emergency Petroleum Allocation Act of 1973 ("EPAA"), as amended, 15 U.S.C. § 754(a)(1); and §§ 210 and 211 of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note. Venue in this district is proper under 28 U.S.C. § 1391(e).

substantial amounts, possibly exceeding $100 million, with no assurance of subsequent recovery."

Before considering plaintiffs' contentions in greater detail, it is necessary to review briefly the factual and byzantine regulatory background giving rise to the present controversy. The Court will first examine "the entitlements program" and the "tertiary incentive program"—the two programs whose "continuation" plaintiffs challenge here.

## I. FACTUAL AND REGULATORY BACKGROUND

### A. *The Entitlements Program*

Pursuant to the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 *et seq.*, DOE has administered a comprehensive system of regulatory price and allocation controls over domestic producers, refiners, and resellers of crude oil and refined petroleum products. These controls placed ceilings upon the prices that producers could charge for domestic crude oil. *See* 10 C.F.R. Part 212, Subpart D.[2] The controls also limited the amount by which refiners could increase their prices above those in effect on May 15, 1973, to the amount by which certain costs, including the cost of purchasing crude oil for use in the refining process, had increased since that date. *See* 10 C.F.R. Part 212, Subpart E. Additional restraints were imposed on the prices that could be charged by resellers and distributors of crude oil and refined petroleum products. *See* 10 C.F.R. Part 212, Subparts F and L.

Although the regulatory price and allocation controls covered most domestic crude oil, they did not impose ceilings on the prices at which foreign crude oil could be sold upon importation into the United States. 10 C.F.R. § 212.53(b). When the price of foreign crude oil rose rapidly during the latter part of 1973 and 1974, a large difference in price developed between foreign crude oil and exempt domestic crude oil, on the one hand, and price-controlled domestic crude oil, on the other. This difference in price became reflected in the costs, and consequently in the maximum lawful prices, of different refiners. Refiners that had relatively better access to the less expensive price-controlled crude oil had a cost advantage over their competitors. Because such refiners' costs had not increased by as much as those of other refiners, those refiners had become subject to maximum lawful prices that were significantly lower than the prices that were permitted to be charged by other refiners. This meant that there were substantial disparities in the maximum lawful prices that could be charged by different refiners and their distributors to the ultimate consumers of refined petroleum products.

Initially these disparities had little competitive effect because the Arab Oil Embargo had so reduced supply that even the highest priced petroleum products could be sold. However, with the increase in supply occasioned by the lifting of the embargo the market place became much more sensitive to price considerations and those refiners relying primarily on imported, new or stripper well oil (all of which were sold at free market prices) were placed at a competitive disadvantage relative to refiners having disproportionately high access to price controlled oil. Small and independent refiners were put at a particular disadvantage because of their disproportionately high reliance on imported oil. The Federal Energy Administration ("FEA"), DOE's immediate predecessor, proposed and adopted the entitlements program in order to deal with these problems. *See generally* 39 Fed.Reg. 31650 (Aug. 30, 1974); 39 Fed.Reg. 39740 (Nov. 11, 1974); 39 Fed.Reg. 42246 (Dec. 6, 1974).

The primary goal of the entitlements program was "to achieve equitable distribution of the low priced old oil among all sectors of the petroleum industry" so as to assure that the sector of the industry lacking proportionate access to price controlled oil, in particular the small and independent refiners, would not be put at a competitive disadvan-

---

**2.** Over time, these regulatory provisions have been amended to exempt, totally or in part, an ever-growing proportion of domestic crude oil

from the operation of the price controls. *See e. g.*, 10 C.F.R. § 212.73(a).

tage because of the government imposed price controls. 39 Fed.Reg. 31650 (Aug. 30, 1974).

In large measure, the goal of the proposal is to improve the access of small and independent refiners to old domestic oil. In addition, however, the proposed program is also designed effectively to provide all refiners with proportionate amounts of old oil, based on their relative refinery capacities. The proposed program is accordingly aimed not only at bringing the small and independent refining sector as a class into a more competitive position with respect to the majors, but it is also specifically designed to assure that all segments of the petroleum industry will benefit equally from lower-priced domestic oil. Thus, the FEA anticipates that in some cases, major oil companies (with a low level of old oil supplies) will benefit by the program, while some small refiners (with a high level of old oil supplies) may be required to buy entitlements under the program. This goal is consistent with the Congressional objectives of achieving equitable distribution of crude oil at equitable prices among all sectors of the petroleum industry and preserving an economically sound and competitive petroleum industry.

*Id.*[3]

These objectives were to be achieved by requiring monthly cash transfer payments from those refiners with relatively better access to price-controlled crude oil to those with little or no access to such crude oil, *see* 10 C.F.R. § 211.67(b) and (c), by reflecting

such payments as immediate adjustments to current crude oil costs, *see* 10 C.F.R. § 211.67(m), and by including them, as adjusted, in the computation of maximum lawful prices in the immediately succeeding month, *see* 10 C.F.R. § 212.83(c)(2). *See generally Husky Oil Co. v. DOE*, 582 F.2d 644 (Em.App.1978); *Cities Service Co. v. FEA*, 529 F.2d 1016 (Em.App.1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); *Pasco, Inc. v. FEA*, 525 F.2d 1391 (Em.App.1975).

The entitlements program set forth at 10 C.F.R. §§ 211.66 and 211.67 operated generally in the following manner. An "entitlement" constituted the right to refine one barrel of price-controlled crude oil. Each month, each refiner[4] was allocated a number of entitlements equal to the number of barrels of crude oil it refined for that month, multiplied by the percentage of price-controlled crude oil in the national crude oil supply. In order to have the right to refine all their price-controlled crude oil, refiners with above-average access to price-controlled crude oil were required to purchase entitlements from refiners that, by virtue of having below-average access to such crude oil, had an excess of entitlements. Thus, pursuant to the entitlements program, there was a substantial transfer of funds each month from those refiners that were required to buy entitlements to those that were authorized to sell entitlements. In that manner, the entitlements program in the long run equalized all domestic refiners' access to price-controlled crude oil and thereby eliminated the com-

---

**3.** Plaintiffs contend that the program was also initiated for a second reason as well—"to provide a basis for roughly equal prices to consumers." (D.I. 7, p. 9.) Plaintiffs point to the fact that the Federal Register notice stated that the purpose of the rule was to "assure that domestically refined petroleum products are sold at equitable prices by all distributors of petroleum products ... in all regions of the United States." Plaintiffs seem to argue that the rule was promulgated as much for the benefit of consumers as for the benefit of refiners. This is not true. Equitable, i. e., equal, prices were desirable because otherwise those refiners forced to charge higher prices because of their disproportionately low access to price controlled oil would sell less oil than those with

greater access and would be put at a competitive disadvantage. Price control was the action which benefited the consumer. The entitlements program was promulgated to ensure that price controls would not cause inequities between refiners and between regions of the country. The program was intended to minimize the inevitable market distortions caused by control and not to benefit consumers.

**4.** Over time, the entitlements program has been amended to expand the categories of participants in the program to include not only refiners but also importers of certain refined products, manufacturers and users of various petroleum substitutes, and other firms. *See* 10 C.F.R. § 211.67(a)(5), (6), and (7).

petitive advantages that had been created by the fact that foreign and some domestic crude oil was exempt from the regulatory price controls.

Although, in the long run entitlements payments equalized proportionately each refiner's access to the price-controlled oil, this was not so on a monthly basis. Because of inevitable administrative delays, entitlements were not issued until two months after the crude oil purchases on the basis of which they were calculated. Within 35 days after the end of each reporting month, every refiner was required to report to DOE the amount and acquisition cost of the various categories of crude oil it had re-

ceived and refined. On the basis of this data DOE would, within ten to fifteen days, calculate the cost of each entitlement for the relevant month, the number of entitlements each refiner was to be issued and the number each refiner would be required to buy or sell. A list was then published in the Federal Register, usually between the 15th and the 20th of each month, setting forth the number of entitlements the refiners were required to buy and sell. Because of the administrative lag, this list related to crude oil receipts from two months earlier. The two month lag was incorporated into the program when it was first established and as a matter of necessity has continued up to the present.[5]

5. Plaintiffs contend that the entitlements program did not attempt to achieve exactly equal proportionate access for all refiners to price controlled oil in the long run but merely attempted to achieve a rough approximation of equal proportionate access on a month to month basis. They contend that entitlements notices based upon oil actually received two months earlier were used on the theory that the relative amounts of old oil and uncontrolled oil received by a refiner during the current month roughly equalled the amounts received two months earlier. The Court disagrees, finding no support for plaintiffs' position in any of the relevant Federal Register notices or in any prior agency interpretations. To the contrary, it appears that the object of the program was to give each refiner, with certain exceptions, exactly equal proportionate access to price controlled oil. Because of the necessary two month lag in the receipt of data, this could only be achieved in the long run. This interpretation is made utterly clear by the following passage taken from the "Entitlements Handbook" which was first published by the DOE no later than September, 1977:

The time lag between crude runs and receipts or payout of entitlement revenue, to be booked against crude costs, is inherent in the data reporting system. Crude oil runs and purchases in the reporting month, for example June, are reported to the FEA by the 5th of August. This time lag is necessary to permit participants to assemble data and complete the report forms, FEA–P102–M–1, FEA–P126–M–O, and FEA–P129–M–O. The FEA must then log receipt of each report, make corrections, input the data to the computer and publish the Entitlement Notice by the 15th of August. Individual participants can then make their entitlement transactions through the end of August. Entitlement revenue, or pay-out, is booked as of the date of the transaction and is applied to crude oil costs incurred in the same month as the

transaction. *Entitlement revenue received or paid-out in any one month may not necessarily equate to cost equalization for any prior month. Total entitlement revenue over a period of time will cost equalize over that period of time plus three months. If the entitlement program were to end with the month of August, data would be reported in October and entitlement transactions would take place in October.* Then if individual participants applied total entitlement revenue, or pay-out, to total crude costs over the life of the program, they would arrive at their equalized net crude cost or net eligible product cost.

(D.I. 14A, Exhibit D) (emphasis added). Plaintiffs further rely upon the fact that entitlements transfer payments were treated as costs or revenues for the month in which they were issued for the proposition that entitlements adjustments were solely for the purpose of "equalizing *current* crude oil costs," and not for the purpose of equalizing access to controlled crude in the long run. See 10 C.F.R. § 211.-67(m)(1). (D.I. 7, pp. 30–33.) They also point to the facts that reporting errors were corrected on a current basis, see 10 C.F.R. § 211.-67(j)(1), purchases of crude oil for the Strategic Petroleum Reserve were reflected in the program on a one-month lagged basis, see 10 C.F.R. § 211.67(a)(7), and entitlements exception relief was granted on an immediate rather than lagged basis, see Somerset Refinery, Inc., 7 DOE ¶ 81,033 (Nov. 21, 1980). (D.I. 16, pp. 9–10.) These facts merely reinforce the Court's conclusion that the entitlements program was designed to ensure equitable distribution in the long run rather than on a current basis. The inclusion of such costs immediately meant that the refiners did not, *in any single month*, have equal proportionate access to price controlled crude. However, in the long run the system was self correcting. For example, the refiner who had a greater than average percentage purchase of controlled crude in one

Plaintiffs in this action are challenging the authority of DOE to issue entitlements notices in February and March, 1981, which because of this two-month delay are based upon oil purchased in December, 1980, and the first 27 days of January, 1981.

### B. *Tertiary Incentive Program*

As crude oil production rates naturally decline in oil fields throughout the nation, producers are faced with the choice of either shutting-in uneconomic wells or investing substantial funds to initiate tertiary enhanced recovery projects [6] to boost production from those wells. DOE realized that producers might be reluctant to make such investments if the crude oil to be produced were to be subject to price controls. In order to provide an incentive for the initiation, expansion, and continuation of enhanced oil recovery projects, therefore, DOE adopted the tertiary incentive program. *See generally* 10 C.F.R. § 212.78; 44 Fed.Reg. 18677 (March 29, 1979); 44 Fed. Reg. 51148 (Aug. 30, 1979).

In its initial form, as published in the Federal Register on July 26, 1978, the tertiary incentive program created incentive by freeing from price controls any increases in crude oil production which resulted from the implementation of a qualified and certified tertiary enhanced recovery project. 43 Fed.Reg. 33679 (August 1, 1978). However, the rulemaking was continued to consider additional incentives which might be created for producers who would be unable to finance tertiary recovery projects unless some of their current price controlled production were freed from controls. The additional incentive that was ultimately adopted allowed producers to recover 75% of certain specified expenses relating to tertiary recovery, up to a maximum of $20 million per project, by charging market prices for crude oil that would otherwise have been controlled. 44 Fed.Reg. 51148 (August 30, 1979); 10 C.F.R. § 212.78. The program was described in the Notice of Proposed Rulemaking as follows:

> Under this proposal, a producer could charge market-clearing prices for some current production, provided that the revenue from such sales in excess of what would otherwise be permitted under the pricing regulations could not exceed seventy-five percent of certain specified expenses actually incurred and reported to DOE. The expenses that could be recouped would be dependent upon the type of enhanced oil recovery (EOR) technique which the project employed. No more than twenty million dollars of expenses could be recouped with respect to a particular project. Unlike the proposal in the July 26 Notice, this proposal does not contain a repayment provision and would permit producers to charge market-clearing prices for crude oil produced from properties other than the one on which their project is located. Moreover, the availability of this proposed incentive would be based on the investment risk presented by a particular project and not on the financial resources of the producer engaged in that project.

44 Fed.Reg. at 18678.

The impact of this program on plaintiffs after January 28, 1981, is based on the fact that at all pertinent times DOE regulations have permitted producers to certify the regulatory classification of crude oil involved in a particular sale "within the consecutive two-month period immediately following the month in which that sale is made." 10 C.F.R. § 212.131(a)(6). Producers, including plaintiffs, have always utilized this provision to recertify prior sales or price-con-

---

month may have nevertheless been entitled to sell entitlements in that month because two months earlier he had had a disproportionately small percentage of controlled crude. He would then be able to charge lower prices than his competitors and would gain a competitive advantage (if, as was the case, there were no shortages in supply). However, in another month or months his entitlements and purchases would give him a disproportionately low percentage of controlled crude and he would be put at a commensurate disadvantage. Thus, the system aimed to achieve long run equity.

6. A tertiary enhanced recovery project seeks to recover additional volumes of crude oil from a reservoir by injecting carbon dioxide or other substances in order to increase pressures in the reservoir and promote additional production.

trolled crude oil as decontrolled oil under any one of several regulations permitting such treatment—*e. g.*, stripper well crude oil and newly discovered crude oil (10 C.F.R. § 212.75). The rule by its terms also applies to tertiary incentive crude oil. 10 C.F.R. § 212.131(a)(5)(iii). By virtue of this regulation, therefore, producers are able to recertify through March 31, 1981, some price-controlled crude oil sold prior to January 28, 1981, as tertiary incentive crude oil.

### C. *Executive Order 12287 and DOE's Response*

On January 28, 1981, President Reagan issued Executive Order 12287 ("the Executive Order") which exempted all crude oil and refined petroleum products from price and allocation controls. That Order provided, in pertinent part:

> By the authority vested in me as President by the Constitution and statutes of the United States of America, including the Emergency Petroleum Allocation Act of 1973, as amended [15 U.S.C. 751 *et seq.*], . . . and in order to provide for an immediate and orderly decontrol of crude oil and refined petroleum products, it is hereby ordered as follows:

> Section 1. All crude oil and refined petroleum products are exempted from the price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended. The Secretary of Energy shall promptly take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order.

> \* \* \* \* \* \*

> Sec. 3. The Secretary of Energy may, pursuant to Executive Order No. 11790 as amended by Executive Order No. 12038, adopt such regulations and take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order.

> Sec. 4. The Secretary of Energy is authorized to take such other actions as he deems necessary to ensure that the purposes of this Order are effectuated.

46 Fed.Reg. 9909–10 (January 30, 1981).

Statements released by the President explaining the Executive Order indicated that the purpose of the Order was multifold. Through his actions the President sought to encourage domestic oil production, conservation, use of alternative fuels, and technological change, to remove the market distortions caused by control, to end the "subsidy" to imported oil which was created by the entitlements program, and to remove the costly reporting requirements. The statements also explained that certain provisions of the oil control system were to remain in effect until March 31, 1981, in order to provide for the orderly termination of controls.[7]

Pursuant to the authority granted it by Section 3 and 4 of the Executive Order, the DOE has taken a number of actions which it deemed necessary to implement the terms of the Order and effectuate its purposes. Thus, on February 3, 1981, the Agency issued a notice announcing a public conference to be held on February 11, 1981, concerning the implementation of the Executive Order and specifically requested "comments and suggestions as to what actions are necessary or appropriate to provide for adjustments to the entitlements program for period prior to decontrol." 46 Fed.Reg. 11291 (February 6, 1981). At that conference, the presiding official announced that entitlements notices for December, 1980, and the first 27 days of January, 1981, would be issued in February and March, respectively.[8] Most representatives of refiners present stated their agreement with this decision. Indeed, a representative of plaintiff, Exxon, was present and voiced no objections to the issuance of such entitlements notices. He did, however, raise the objections pressed by plaintiffs here to any continuation of the tertiary incentives program.[9]

---

7. D.I. 11A, Exhibits 2 & 3.

8. D.I. 11A, Ex. 13.

9. D.I. 11A, Ex. 14.

On February 12, 1981, for the express purpose of "promot[ing] the immediate implementation of this Executive Order," the DOE issued Ruling 1981–1. 46 Fed.Reg. 12945 (February 19, 1981). By means of the Ruling, the DOE sought to answer some of the questions which it had received "concerning the Executive Order and DOE regulations after January 27, 1981." Consequently, the Ruling was framed in a series of questions and answers.

Plaintiffs here challenge two parts of the Ruling—(a) question and answer # 2, concerning the issuance of entitlements with respect to oil sold in the two months preceding the Executive Order and (b) question and answer # 7 concerning recertification pursuant to the tertiary incentive program of oil sold in the two months before the Executive Order. Question and answer # 2 provided, in relevant part:

Question # 2: How does the Executive Order affect the issuance of entitlements notices for the period prior to January 28, 1981 under 10 CFR §§ 211.66 and 211.67 (the Entitlements Program)?

Answer # 2: In § 3 of the Executive Order the Secretary of Energy is given authority to promulgate entitlements notices for periods prior to January 28, 1981, and further to establish a mechanism for entitlements adjustments for periods prior to the Executive Order. Thus, the Secretary will publish in February 1981 an entitlements notice which accounts for crude oil runs to stills in December 1980. The Secretary will also publish in March 1981 an entitlements notice reflecting crude oil runs to stills from January 1, 1981 through January 27, 1981.

\* \* \* \* \* \*

[The mechanisms for reporting provided by the various relevant DOE regulations already properly promulgated were then described in detail.]

\* \* \* \* \* \*

The DOE will develop a mechanism to implement any adjustments to the Entitlements Program resulting from changes or corrections in crude oil receipts, runs to stills, volumes of other eligible products or volumes of petroleum

substitutes by refiners and other eligible firms for months or partial months prior to January 28, 1981.

46 Fed.Reg. at 12946 (February 19, 1981). Question and answer # 7 provided:

Question # 7: May a firm first become a qualified producer as defined in 10 CFR § 212.78(c) on or after January 28, 1981? Moreover, may the retroactive recertification of crude oil sold in the months of December 1980 and January 1981 as tertiary incentive crude oil be used to recover recoupable allowed expenses that are incurred, paid, and reported after the effective date of the Executive Order, but within the consecutive two-month period within which retroactive certification is permitted under 10 CFR § 212.131(a)(6)?

Answer # 7: The Tertiary Incentive Program provides that first sales of crude oil by or on behalf of a qualified producer are not subject to the ceiling price limitations of 10 CFR Part 212, Subpart D, provided that the tertiary incentive revenue does not exceed the allowed expenses attributable to the producer. Tertiary incentive revenue is the difference between the controlled price and the market price received by the qualified producer in accordance with 10 CFR § 212.78 and constitutes the front-end money which is the incentive that the program is intended to provide.

Absent the Executive Order, a qualified producer that would have incurred, paid, and reported its allowed expenses prior to February 28 and March 31, 1981, respectively, could have recovered those expenses through the recertification of crude oil sold in the months of December 1980 and January 1981, respectively, as long as those recertifications were made within the consecutive two-month period within which such certification is permitted under 10 CFR § 212.131(a)(6). Executive Order 12287 is intended to provide for an immediate decontrol of crude oil and refined petroleum products. The Order does not abrogate the right that accrued to a firm to establish prices for crude oil prior to January 28, 1981. Thus, a firm may become a qualified producer

as defined in 10 CFR § 212.78(c) on or after January 28, 1981. A qualified producer may also recover allowed expenses through the recertification of crude oil sold in the months of December 1980 and January 1981, respectively, as long as the producer has incurred, paid, and reported those expenses prior to February 28 and March 31, 1981, respectively.

46 Fed.Reg. at 12947 (February 19, 1981).[10]

Accordingly, on February 20, 1981, DOE published the monthly entitlements notice based upon purchases of crude oil made by refiners in December, 1980. 46 Fed.Reg. 14157 (February 26, 1981). This entitlements notice required plaintiffs to purchase entitlements costing substantial sums of money.[11] The January entitlements notice, however, which normally would have been issued in March, was stayed on March 11, 1981, by a preliminary injunction issued in *Winston Refining Co. v. DOE*, (N.D.N.C. 1981), slip opinion, C.A. No. C–81–78–WS (March 11, 1981). That injunction prohibited DOE from issuing the final regular entitlements notice until it adopted and made effective a mechanism for implementing, after the issuance of the final regular entitlements notice, adjustments and corrections to entitlements rights and obligations for periods prior to January 28, 1981. Before the issuance of that preliminary injunction the DOE had already published a proposed rule which would establish such an adjustment mechanism. 46 Fed.Reg. 15112 (March 3, 1981).

Finally, on March 17, 1981, the DOE issued an Advance Notice of Proposed Rulemaking stating the Department's intention to conduct a rulemaking to rescind the Tertiary Incentive Program with respect to any

allowed expenses that had not been "incurred and paid" as of March 19, 1981. 46 Fed.Reg. 17566 (March 19, 1981). The Agency's reasons for that action were stated in the Notice:

ERA has concluded that continuation of the tertiary incentive program beyond March 19, 1981 will not meaningfully increase the production of crude oil, but will likely result in large amounts of funds expended on behalf of future production being subsidized by refiners through recertification of previously sold price-controlled crude oil. This conclusion is based upon our belief that tertiary projects which this program was designed to enhance are most likely already to have been certified and appropriate expenses incurred and paid. Any project that has waited so long to become certified and any expenses that have not already been incurred and paid are not likely to need the benefits of the tertiary incentive program.

*Id.*

## II. THE PLAINTIFF'S CONTENTIONS ON THE MERITS

Plaintiffs contend that DOE's issuance of entitlements notices for oil sold in December, 1980, and the first part of January, 1981, and DOE's enforcement of any retroactive price increases under the tertiary incentive program are illegal for several reasons. Their principal contention is that the Executive Order ended both programs and all transfer payments under those programs even with respect to payments for oil purchased and sold before the promulgation of the Executive Order. They contend, therefore, that the interpretation adopted

---

**10.** 10 C.F.R. §§ 212.131(a)(6) and 212.131(b), which were validly promulgated and in force as of January 28, 1981, allowed a producer of price controlled crude oil, in certain specified circumstances, to recertify price controlled oil which it had previously sold as price exempt oil and retroactively increase its price within a two month period following the sale. In answers to questions # 5 and # 6 the DOE ruled that the Executive Order did not affect the producers' right to recertify oil sold before the promulgation of the Order and to retroactively increase its price. Consequently, if the producer met

the standards set forth in 10 C.F.R. §§ 212.-131(a)(6) and 212.131(b) they could recertify the oil sold in December and January and retroactively increase its price in February and March, respectively.

**11.** Plaintiffs Exxon, Diamond Shamrock, Texaco, and Kerr-McGee were required to purchase entitlements in the amount of $143,615,294, $2,408,773, $35,970,290, and $7,183,185, respectively. (D.I. 7, Ex. A, ¶ 5, Ex. B, ¶ 3, Ex. C, ¶ 6, and App. 3.)

by Ruling 1981–1 is incorrect and should be declared invalid. Alternatively, they contend that Ruling 1981–1 is a substantive rule repromulgating the two programs terminated by the Executive Order and is illegal and without the force of law for several additional reasons. First, they contend that it is illegal because under the Executive Order the DOE lacked the power to repromulgate the two programs. Second, plaintiffs maintain that Ruling 1981–1, as a substantive rule, is invalid because of DOE's failure to comply with "a host of rulemaking requirements." Specifically, they contend that the Ruling is invalid because of the following procedural defects: (1) DOE failed to engage in the notice and comment rulemaking required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b) and (c), and section 501(b) of the Department of Energy Act ("DOE Act"); (2) DOE failed to give an "opportunity for the oral presentation of views, data, and argument" which is required by Section 501(c) of the DOE Act, 42 U.S.C. § 7191(c) before the issuance of a "rule, regulation, or order . . . likely to have a substantial impact on the nation's economy or on large numbers of individuals or businesses."; (3) DOE failed to give explicit consideration of the relationship of the "proposed rule" to the nine statutory objectives set forth in Section 4(b)(1) of the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 753(b)(1); (4) DOE failed to publish the "rule" at least 30 days before its effective date as required by the APA, 5 U.S.C. § 553(d); and (5) promulgation of any final rule during the period from January 29, 1981 until March 30, 1981, was forbidden by a memorandum issued by President Reagan to the Secretary of DOE and other Government departments. 46 Fed.Reg. 11227 (February 6, 1981). Plaintiffs contend that Ruling 1981–1 was invalid on this last ground whether it is substantive or interpretive because the memorandum defined "rule" as any agency statement of general applicability or future effect designed to implement, interpret, or prescribe law or policy . . .". *Id.* at 11228. Third and finally, plaintiffs contend that Ruling 1981–1 is invalid because any enforcement of the entitlements and tertiary incentive programs after January 27, 1981, serves no legitimate regulatory purpose and is therefore irrational, arbitrary, and capricious. *See* 5 U.S.C. § 706.

## III. THE STANDARDS FOR A PRELIMINARY INJUNCTION

Plaintiffs presently seek a preliminary injunction. The standards governing the grant of such extraordinary interlocutory relief are well established in this Circuit:

> . . . the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. *Delaware River Port Auth. v. Transamerican Trailer Transp. Inc., supra,* [501 F.2d 917,] at 919–20 (3d Cir.); *see A. L. K. Corp. v. Columbia Pictures, Inc.,* 440 F.2d 761, 763 (3d Cir. 1971). Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Delaware River [Port] Auth. v. Transamerican Trailer Transp., Inc., supra* at 920.

*Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 815 (C.A.3, 1978). *Accord Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120 (C.A.3, 1980); *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515 (C.A.3, 1976); *League of Voluntary Hospitals and Homes of New York v. Local 1199, Drug and Hospital Union,* 490 F.2d 1398 (Em.App.1973); *Avins v. Widener College, Inc.,* 421 F.Supp. 858 (D.Del.1976).

Although the Court must consider each of these four elements and attempt to strike a "delicate" balance of all four, *Constructors Association of Western Pennsylvania v. Kreps, supra,* 573 F.2d at 815, each of the four does not carry equal weight. A preliminary injunction is extraordinary relief and consequently the movant bears a burden of showing, at a minimum, that he

has a reasonable probability of success on the merits and that he will be irreparably injured without relief *pendente lite. A.O. Smith Corp. v. F.T.C., supra,* 530 F.2d at 525; *Avins v. Widener College, Inc., supra,* 421 F.Supp. at 860. It is particularly important that a movant show irreparable injury. Indeed, it is the fact that injury may occur which cannot be repaired or compensated for at the end of the litigation that supplies the very rationale for granting any sort of relief before a full hearing on the merits. *See Sampson v. Murray,* 415 U.S. 61, 88–92, 94 S.Ct. 937, 951–953, 39 L.Ed.2d 166 (1974); *A.O. Smith Corp. v. F.T.C., supra,* 530 F.2d at 525; *Avins v. Widener College, Inc., supra,* 421 F.Supp. at 861.

### A. *Irreparable Injury*

■ Although the Court finds that none of the relevant four elements militates in favor of the grant of a preliminary injunction, it finds particularly telling plaintiffs' utter failure to show even the minimum requirement of irreparable injury. The only injury which plaintiffs allege is of a monetary nature. They contend that without a preliminary injunction they will have to pay out many millions of dollars as a result of the operation of the two programs that they challenge. They further contend that it will be difficult to recover the money should they ultimately prevail because the money will have gone to many recipients and because some of the recipients are likely to be unspecified.small refiners who may, under decontrol, fold and be unable to return any funds they may have received under the challenged programs. This is clearly not enough to constitute irreparable injury.

■ As a general rule mere monetary damages or losses of profits will not constitute irreparable injury. By their very nature such injuries can be adequately compensated at the end of the litigation and consequently are not *irreparable. Sampson v. Murray, supra,* 415 U.S. at 88–92, 94 S.Ct. at 951–953; *Avins v. Widener College, Inc., supra,* 421 F.Supp. at 861; *N.W. Controls, Inc. v. Outboard Marine Corp.,* 317 F.Supp. 698, 703 (D.Del.1970). In *A.O. Smith Corp.*

*v. F.T.C., supra,* 530 F.2d at 525, Judge Aldisert noted as much:

[T]he requisite is that the feared injury or harm be irreparable—not merely serious or substantial. "The word means that which cannot be repaired, retrieved, put down again, atoned for.... Grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money. The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it ...." *Gause v. Perkins,* 3 Jones Eq. 177, 69 Am.Dec. 728 (1857). "Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate." *Danielson v. Local 275, Laborers Union,* 479 F.2d 1033, 1037 (2d Cir. 1973). *See generally* E. Re, Cases and Materials on Equity and Equitable Remedies 1018–35 (1975).

The court in *A.O. Smith, Corp.* later went on to find that without a showing that a loss of profits caused by the challenged action would be so great "that significant changes in the company's operations would be necessitated," that the company's reputation or goodwill might be permanently injured, or that the company would be rendered insolvent, no irreparable injury can be found.

Plaintiffs nevertheless contend that "substantial monetary losses ... constitute irreparable injury where compensation may not be available because of the likely inability of the opposing party or third persons to make good the losses," *citing Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 137 (C.A.3, 1980) and *SK&F, Co. v. Premo Pharmaceutical Lab.,* 625 F.2d 1055, 1066 (C.A.3, 1980). *SK&F, Co.* simply does not support this contention. The injury found in that case was irreparable injury to the moving firm's business reputation that would be caused absent a preliminary injunction. While *Eli Lilly* does lend support for the proposition cited, the highly unusual facts of that case clearly distinguish it from the present case and would lead the court to limit *Eli Lilly* to its peculiar facts. That case was a patent suit

where, in order to obtain preliminary relief, a movant must show *beyond question* that the patent in suit is valid and infringed. *See Jenn-Air Corp. v. Modern Maid Co.*, 499 F.Supp. 320 (D.Del.1980). The movant in *Eli Lilly* had met this heavy burden, marshalling a compelling case on the merits. Moreover, the defendant, a small "metooer" in the pharmaceutical industry was in Chapter XI reorganization, was being sued by four other pharmaceutical companies for patent infringement, was infringing a patent for a product whose annual sales exceeded $100,000,000, and had annual profits of only $2,000,000. In these circumstances, the movant had shown that without preliminary relief, the movant would certainly suffer losses far in excess of any compensation it could hope to receive at the end of the litigation.

This is simply not the case here. First, as noted earlier, DOE is currently developing regulations whereby defendants may obtain repayment of any excess entitlements payments they may make and the final entitlements notice may not be published until a proper mechanism for relief is established. Second, plaintiffs have not shown that the recipients of entitlements or tertiary incentives payments will be unable to return any funds if plaintiffs should ultimately prevail on the merits. The vast majority of producers who have applied to have projects qualified as Tertiary Enhanced Oil Recovery Projects are major oil companies who would readily be able to pay back any funds wrongly obtained.[12] Similarly, approximately 85% of Exxon's February entitlements purchases were from Arco Petroleum Products ($120,160,579.44) and American Petrofina ($1,755,706.92)[13] who are major refiners and undoubtedly would be able to repay plaintiffs should plaintiffs ultimately prevail. Moreover, plaintiffs' contention that a portion of their payments may go to small refiners some of whom may fold because of decontrol is altogether too speculative to support a finding of irreparable injury. Such a wholly conjectural injury does not satisfy the standard required for a preliminary injunction. *See Constructors As-*

sociation of Western Pennsylvania v. Kreps, supra, 573 F.2d at 818; A.O. Smith Corp. v. F.T.C., supra, 530 F.2d at 526–27. Third, and finally, far from making a compelling case on the merits, as was the case in *Eli Lilly*, the Court finds, *infra*, that plaintiffs here have failed to show a probability of success. Consequently, the Court concludes that it must deny plaintiffs' motion because they have failed to show irreparable injury.

## B. The Merits

■ However, even if some irreparable injury had been shown, the Court would deny plaintiffs' motion because they have failed to make an adequate showing that they are likely to prevail on the merits. Plaintiffs' contentions on the merits were described earlier.

Many of those contentions are premised on Ruling 1981–1 being a substantive rule. This, however, is not the case. The Court finds that Ruling 1981–1 was merely an interpretation of the effects of the Executive Order on the already existing and validly promulgated rules governing the entitlements program and tertiary incentives program.

It is beyond cavil that the distinction between substantive and interpretive rules is an unclear one. Nevertheless there are certain guidelines. The Court must first look to the Agency's authority and intent. If the Agency lacks the power to enact substantive, "legislative-type" regulations or if the Agency's intent is only to interpret other rules or legislation rather than create new rights and duties, then the rule will be considered interpretive and treated as such both for the purposes of determining the standard of review and to determine whether various procedures were required in its promulgation. *See General Electric Co. v. Gilbert*, 429 U.S. 125, 140–142, 97 S.Ct. 401, 410–411, 50 L.Ed.2d 343 (1976); *Cerro Metal Products v. Marshall*, 620 F.2d 964, 981–82 (C.A.3, 1980); *Joseph v. United States Civil Service Commission*, 554 F.2d 1140, 1153, n.24 (C.A.D.C.1977); 2 K.C. Davis, Adminis-

---

12. D.I. 7, Ex. 5.

13. D.I. 3, ¶ 5.

trative Law Treatise §§ 7:8, 7:9, 7:10, 7:11, 7:16 & 7:17.

■ Under these tests, Ruling 1981–1 is clearly interpretive. The Executive Order specifically directed DOE to "promptly take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order." As noted earlier, the tertiary incentives program and the entitlements program were enacted solely because of the existence of price controls and for the DOE to recreate them would clearly be contrary to the directive in the Executive Order. Consequently the DOE lacked the power to *create* such programs. Secondly, the format of the Rule and its effect also clearly indicate that its intent is solely to interpret the Agency's prior regulations and the Executive Order. In determining whether a rule is intended to be interpretive or substantive, a court may look to whether the rule has a substantial impact upon those affected by creating new rights, duties or procedures. *Pharmaceutical Manufacturers Association v. Finch*, 307 F.Supp. 858 (D.Del.1970); 2 K.C. Davis, Administrative Law Treatise § 7:17. Ruling 1981–1 has no such novel impact. In fact, it has no impact at all upon plaintiffs by its own force. The sole impact felt by plaintiffs is by virtue of already enacted rules. The Ruling simply interprets the effect of the Executive Order upon those rules.

The Court's determination that Ruling 1981–1 was an interpretive rule has two principal effects upon the issues in this litigation. First, it reduces and simplifies plaintiffs' contentions to the following two. Their first and principal contention is that the interpretation of the regulations establishing the two challenged regulations which is made by Ruling 1981–1 is incorrect. The second is that the Ruling is invalid because the promulgation of any rule whatsoever was forbidden by President Reagan's Memorandum of February 6, 1981. 46 Fed.Reg. 11227 (February 6, 1981). The Court finds the latter contention frivolous in light of the fact that the Executive Order specifically authorized DOE to "adopt such regulations and take such actions as he deems necessary to implement this Order." Executive Order 12287, Sec. 3, 46 Fed.Reg.

9909 (January 30, 1981). Thus, plaintiffs' only serious contention on the merits, and, indeed, the only argument that they seriously pursued at oral argument, was that Ruling 1981–1 adopted an erroneous interpretation of the effect of the Executive Order on the regulations establishing the entitlements system and the tertiary incentives system.

■ The second effect of finding Ruling 1981–1 to be an interpretive rule is that the judgments it contains do not carry as great weight as they would if the Court were considering a substantive/legislative rule. In considering a challenge to an interpretive rule, the Court need not defer to the Agency's judgment but, rather, may independently interpret the legislative scheme at issue—in this case the Executive Order and the regulations establishing the two challenged programs. This does not mean that the Agency's judgment is totally devoid of weight. In the seminal case of *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) the Supreme Court set down the following comprehensive set of guidelines to be used in determining the degree of weight an Agency interpretation should be afforded by a reviewing court:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Accord, General Electric Co. v. Gilbert, supra*, 429 U.S. at 141–42, 97 S.Ct. at 410–11.

With this in mind, the Court will now turn to the regulations and Order at issue, both of which were described and discussed earlier. The Court's independent evaluation leads it to the conclusion that the agen-

cy interpretations incorporated in Ruling 1981–1 are probably correct.

First, the Court concludes from an examination of the clear and unambiguous terms of the Executive Order as well as from its earlier examination of the entitlements program, that the Ruling appears to be correct in its interpretation of the effect of the Order on that program. The Order provides in Section 3 that "[t]he Secretary of Energy may . . . adopt such regulations and take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods° prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order." Read in context, the explicit reference to "promulgation of entitlements notices for periods prior to this Order" can only contemplate the regular promulgation of notices for crude oil purchases which took place in December and January. Plaintiffs contend that this phrase refers only to the promulgation of entitlements "to correct for errors in prior months." [14] Such an interpretation, however, ignores the fact that in the same sentence the Order also allows "the establishment of a mechanism for entitlements adjustments for periods prior to this Order." Because the Order specifically calls for the establishment of such a mechanism which would "correct for errors in prior months," to read the Order's authorization to promulgate entitlements to allow only the same thing would render the two phrases redundant. The Court will not adopt such a strained reading.

Examination of the relevant regulations, the Federal Register Notices proposing and adopting those regulations, and past agency statements and practice also lead to the conclusion that DOE's interpretation appears to be correct. As the Court discussed at length earlier in the opinion, the entitlements program has always run on a lagged basis, because of delays in data accumulation. The system aimed at giving refiners equal access in the long run to the price benefits caused by the control of crude oil prices. The Court has already specifically rejected plaintiffs' notion that the system was always run on a "current basis" and used stale data merely because that data provided the best approximation of the current state of affairs. (*See* note 5, *infra*.) Indeed, the Court noted that according to DOE's long-standing interpretation of the entitlements program, this lag would necessitate the promulgation of entitlements notices two months after the program ended. Such a long-standing interpretation developed outside of the context of litigation should be afforded deference. Given this interpretation of the system and its regulations, which has been adopted by the Court, the Order's reference to entitlements notices "for periods prior to this Order" must include entitlements based upon oil sales in December and January.

Finally, such an interpretation is not, as plaintiffs argue, irrational because it produces a windfall for producers who will be able to sell entitlements. For example, if one assumes there is a two month or greater lag between purchases of crude oil and sales of refined products, the December and January entitlements will effectuate the very purpose of the entitlements program— that of giving all refiners equal access to the benefits of price controlled crude oil. Without the entitlements in such a case, refiners such as Exxon, which made large purchases of price controlled crude oil in December and January, would get a disproportionately large windfall when they sold their refined products at decontrolled prices. The payment of entitlements will distribute the windfall equitably among all refiners. Alternatively, if one assumes that all the crude oil purchased in a month is sold as refined products during that same month, then the windfall which sellers of entitlements receive now will be balanced by losses sustained during the times the entitlements program was in effect and the two month period before any entitlements were issued. During those periods, because the data was never current, some refiners were always put at a disadvantage because their disproportionately low access to price

14. D.I. 7, p. 17.

controlled crude oil forced them either to charge higher prices and suffer lower sales or temporarily to "bank" the higher costs, thus cutting into profits. The continuation of entitlements for two more months will simply even accounts. While plaintiffs here will now either have to charge higher prices or absorb the higher costs, this present detriment is equally balanced by earlier advantages. Thus, because under each of the two extreme hypotheticals (the real situation must lie somewhere between) posited above publication of the entitlements for oil purchases in December and January would be equitable, the Court must also conclude that, with regards to the entitlements program, Ruling 1981–1 is rational.

The Court finds the plaintiffs' position regarding the tertiary incentive program to be somewhat stronger, but not sufficiently compelling to meet their burden of showing a probability of success on the merits. Indeed, the Court finds DOE's position supported by a very tenable argument.

Plaintiffs here are challenging the interpretation contained in Ruling 1981–1 which allows producers retroactively to increase prices of crude oil sold before January 28, 1981, in order to recoup certain expenses incurred and paid for after that date. The Executive Order simply exempted petroleum products from any further price and allocation controls and had no effect upon sales completed before January 28, 1981. Moreover, it did not revoke any validly promulgated regulations but instead, directed DOE to "take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order." Thus, the regulations allowing retroactive price increases in order to recoup certain expenses are still in force and because the President's Order did not apply to the oil sales before January 28, 1981, those still valid regulations would work to allow retroactive price increases.

This interpretation, which is in accord with the clear language of the Executive Order does not, as plaintiffs suggest, work an absurd result. The allowance of retroactive price increases will still serve the original purpose of the tertiary incentives program and will even advance the purposes of the President's decontrol Order. It will encourage production by encouraging investment in tertiary recovery projects. Moreover, many of the projects which seek use of the retroactive price increases were probably planned well before the Executive Order and the use of retroactive price increases to provide front end money was probably a material consideration in the planning. Plaintiffs, however, contend that continuing to allow such retroactive recertification after decontrol has spawned a host of new tertiary recovery projects and that producers who will not initiate projects for years to come are incurring expenses now to take advantage of the last two months of the program. The Court notes that, in such case, the continuation of the program is serving its purpose by encouraging such projects. In any case, the problem of which plantiffs complain has been recognized by DOE and is being remedied by rulemaking which would rescind the tertiary incentive program with respect to any allowed expenses that are incurred or paid after March 19, 1981. In its advance notice of proposed rulemaking, DOE stated:

ERA has concluded that continuation of the tertiary incentive program beyond March 19, 1981 will not meaningfully increase the production of crude oil, but will likely result in large amounts of funds expended on behalf of future production being subsidized by refiners through recertification of previously sold price-controlled crude oil. This conclusion is based upon our belief that tertiary projects which this program was designed to enhance are most likely already to have been certified and appropriate expenses incurred and paid. Any project that has waited so long to become certified and any expenses that have not already been incurred and paid are not likely to need the benefits of the tertiary incentive program.

In light of the above, ERA is giving notice hereby that it intends to eliminate the ability to recoup tertiary expenses pursuant to 10 CFR § 212.78 with respect to any expenses not already incurred and paid as of March 19, 1981. A Notice of

Proposed Rulemaking formally proposing this regulatory change will be published in the near future.

46 Fed.Reg. 17566 (March 19, 1981).

Consequently, the Court concludes that DOE's interpretations of the effects of the Executive Order upon the tertiary incentives program regulations are reasonable and that these interpretations will not have an unreasonable effect but will further the purposes of both the Order and the original regulations. The Court therefore concludes that plaintiffs have failed to show a probability of success on the merits.

## C. *Effect Upon Third Persons and the Public Interest*

The Court further bases its conclusion that a preliminary injunction is unwarranted in this case because it has concluded that the grant of such relief would harm third parties and would disserve the public interest.

First, comments received by the DOE [15] and an affidavit presented to this Court on behalf of *amicus curiae*, Tosco Corporation, indicate that many sellers of entitlements have made business commitments predicated upon their receipt of the revenues of sales of entitlements for the months of December and January. Furthermore, the delay of those sales that would be caused by the issuance of a preliminary injunction would cause severe cash flow problems for them.

15. D.I. 14A, Ex. B.

The same is true of the tertiary incentive program. The Court can take judicial notice of the fact that oil production projects, like all major business ventures, are not planned on the spur of the moment. Consequently, many producers have probably made commitments based upon the expectation that they would be able to receive front end money through the tertiary incentives program. Consequently, the issuance of a preliminary injunction would clearly work a hardship on third parties.

Second, the public interest would be disserved if this Court, by way of a preliminary injunction, were to interfere with the efforts of the agency charged by the President's Order with responsibility of decontrolling oil to do so in a fair and orderly manner. The comments received by DOE from all refiners as well as the Executive Order and the Presidential Press releases reflected the judgment of all that the rapid and orderly termination of the residuals of the formerly pervasive system of oil control would be in the public interest. The issuance of a preliminary injunction would both delay and complicate that process.

It is for the foregoing reasons that the Court, on March 27, 1981, ruled from the bench denying plaintiffs' motion. A written order will be entered confirming that oral ruling.