## UNION OIL COMPANY OF CALIFORNIA, Plaintiff,

v.

## UNITED STATES DEPARTMENT OF ENERGY and James B. Edwards, Jr., Secretary of Energy, Defendants.

No. 81–1961.

United States District Court,
C. D. California.

Jan. 25, 1982.

Paul J. Mode, Jr., William J. Perlstein, Wilmer, Cutler & Pickering, Washington, D. C., for plaintiff, Union Oil.

Peter Aron, Takoma Park, Md., Kathrine L. Henry, Dept. of Energy, Washington, D. C., for defendant, Dept. of Energy.

## OPINION

HATTER, District Judge:

Union Oil seeks to have Department of Energy (DOE) Ruling 1981–1 of February 19, 1981 declared unlawful. That ruling was made in the wake of President Reagan's Executive Order of January 28, 1981, which ended price controls on domestic crude oil. Union claims the ruling is unlawful because it extended incentives available for the recovery of tertiary oil beyond this cutoff date. Because of the complexity of this issue some discussion of the background and history of crude oil price controls and the tertiary incentive program is necessary.

## I

### FACTUAL BACKGROUND

In 1973, Congress enacted the Emergency Petroleum Allocation Act, which imposed price controls on most of the crude oil produced in this country. Imported oil was not covered by this Act and could be sold at market prices.

After the 1973 Arab Oil Embargo, the market price of imported crude rose dramatically. Prices for controlled domestic oil, on the other hand, remained relatively stable. Refiners whose primary source of supply was imported crude were placed at a competitive disadvantage.

To rectify this problem, the Federal Energy Administration (FEA and predecessor to the Department of Energy) enacted a system of regulations known as "the entitlements program". (See 10 C.F.R. § 211.67 (1981).) One entitlement gave a refiner the right to purchase one barrel of cheaper domestic crude oil. The number of entitlements issued was determined as follows. The FEA computed the percentage of controlled domestic oil in the market for each month. A refiner's monthly production was then multiplied by this percentage to arrive at the number of entitlements it should receive.

For example, assume the market consisted of 40% domestic controlled crude. If a refiner processed 1,000,000 barrels of oil under such market conditions, it would be allocated 400,000 entitlements. Thus, each refiner received a number of entitlements equal to its imputed *pro rata* share of the domestic crude market.

The entitlements program then equalized pricing disparities in the following manner. Assume the refiner mentioned above (referred there as refiner A) actually purchased only 20% or 200,000 of its 1 million barrels of oil from controlled domestic sources. It would therefore need only 200,000 of its 400,000 entitlements. Refiner A would then sell its surplus 200,000 entitle-

ments to refiners who were in a deficit position (i.e., those whose actual purchases of controlled oil exceeded their monthly entitlement allowance).

The money paid for these entitlements by "deficit" refiners would subsidize or reimburse Refiner A for the higher prices it paid when it had purchased a greater proportion of more expensive imported crude oil. In this way all refiners would be placed on an equal competitive footing.

Entitlement data was compiled monthly by the FEA and later by its successor DOE. Monthly entitlement notices were then published in the Federal Register. Because of the administrative lag time involved, these notices were published two months after the data had been collected. The two month lag was a recognized part of the system, and while it did create temporary inequities, these were theoretically balanced out over the long haul. *See generally Diamond Shamrock Corp. v. Edwards*, 510 F.Supp. 1376, 1379–80 (D.Del.1981).

### A. The Tertiary Incentive Program

In 1976, Congress recognized the need to give domestic oil producers greater incentives in order to reduce this nation's dependence on imported oil. Of particular concern was the recovery of petroleum which could only be extracted by "tertiary" or enhanced oil recovery (EOR) techniques. These included the injection of hydrocarbons, steam, alkalines, or displacement by miscible fluids or non-hydrocarbon gases.

10 C.F.R. § 212.78(d) (1981). Congress, therefore, amended the Emergency Petroleum Allocation Act to permit additional incentives for tertiary oil. Energy Conservation and Production Act, § 122, Pub.L.No. 94–385, adding EPAA § 8(j)(1)(A) (codified at 15 U.S.C. § 757(j)(1)(A) (1976)). The Department of Energy then enacted a series of regulations which enabled tertiary producers to sell their oil at prevailing market prices. See 10 C.F.R. § 212.78 (1981); 42 Fed.Reg. 2647 (1977).

As originally structured, this exemption from price controls only applied to the sale of tertiary oil *after* it had been produced by one of the enhanced recovery techniques. It did not help crude oil producers who wanted to initiate *new* tertiary projects, but who lacked the capital to overcome prohibitively high start-up costs. Until tertiary oil could be produced and sold, no benefits could be derived under this program.

The Department of Energy remedied this situation by allowing a potential tertiary producer to reclassify or recertify its *other* sales of price-controlled domestic crude as tertiary oil. This could be done *at the time* the producer incurred additional expenses from the use of advanced recovery techniques. This reclassified oil could then be sold at higher prevailing market prices. The producer, thus, recouped most of his or her advanced recovery expenses as they were incurred. 44 Fed.Reg. 51148–49 (1979).[1]

1. Under this program a producer could recoup 75% of its advanced recovery expenses or a maximum of $20,000,000 on each project. 10 C.F.R. § 212.78(c) (1981). A sufficient quantity of price controlled oil was reclassified as tertiary until the additional revenues realized from market priced sales matched the level of expenses allowed under the regulations.

As time went on, additional incentives were allowed under the tertiary program. In June 1980, DOE amended the regulations so that a producer could deduct its Windfall Profit and *ad valorem* property taxes from its revenue figures. 45 Fed.Reg. 40106–07 (1980), *modifying,* 10 C.F.R. 212.78(c). This change had the following effect. By deducting these taxes from the total amount of revenue gained, a producer would then be able to reclassify that much more oil as decontrolled crude. For in-

stance, assume a 70% tax rate. Also assume that a producer expended $1,000,000 in tertiary recovery projects. Under the regulations he or she could recoup $750,000 (i.e. 75% of $1,000,000). If controlled oil was selling at $10 a barrel and decontrolled oil at $60, this producer would gain $50 of additional revenue on each barrel of oil reclassified. Under the original program, the producer could reclassify a maximum of 15,000 barrels of oil in recouping tertiary expenses. (This figure is arrived at by dividing the allowable expenses ($750,000) by the revenue gained per barrel ($50)). But under the amended program this producer would only be deemed to gain a fraction of this $50 of additional revenue because of taxes paid. Seventy percent (70%) or $35 of this gain would be deemed to be consumed in taxes. Thus, the producer would only attribute $15 per barrel as

Because large amounts of crude oil were reclassified from controlled to decontrolled oil under this program, the amount of controlled oil deemed to be in the national supply was significantly reduced. This, in turn, had a major impact on the entitlements program. With less controlled crude deemed to be in production, the overall percentage of controlled oil used to calculate the monthly allotment of entitlements dropped. As a result, refiners received a smaller share of monthly entitlements. Many, who had previously been entitlement creditors, now found themselves in a deficit position and forced to buy into the entitlement market. 46 Fed.Reg. 25315 (May 6, 1981).

### B. The Executive Order Ending Crude Oil Price Controls

On January 28, 1981, President Reagan announced the immediate decontrol of domestic petroleum prices in Executive Order No. 12287. The Order stated in part that:

All crude oil and refined petroleum products are exempted from the price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended. The Secretary of Energy shall promptly take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order.

Notwithstanding Section 1 [above paragraph] of this Order:

(a) All reporting and record-keeping requirements in effect under the Emergency Petroleum Allocation Act, as amended, shall continue in effect until eliminated or modified by the Secretary of Energy.

[The Order then enumerated three specialized "sub-programs" not to be immediately dismantled. They were: state set aside for middle distillates, middle distillates for surface passenger mass transit, and the Canadian Allocation Program.]

Following the Executive Order, numerous questions arose concerning its implementation. Most of these concerned how long producers could continue to recertify price controlled oil sold immediately prior to the Executive Order. Because of the two-month lag built into the reporting system, it was possible for producers to have qualified for exemptions from price controls prior to the January 28th decontrol order, but unable to recertify their sales until some time after that date.

In response to a question regarding recertification in general, the Department of Energy replied that:

If crude oil would have otherwise qualified for lawful recertification ... prior to the implementation of the Executive Order, a producer may recertify ... crude oil sold in the months of December 1980 and January 1981 ... within the consecutive two-month period immediately following the month in which the sale was made.

46 Fed.Reg. 12947 (February 19, 1981) (Answer # 5). Emphasis added.

But DOE changed its tune when asked specifically about tertiary incentive oil. In Answer Number 7, it noted that:

Executive Order 12287 is intended to provide for an immediate decontrol of crude oil and refined petroleum products. The

---

additional revenue gained by recertification (i.e. $50–$35). Now it could reclassify that many more barrels of oil at $15 instead of $50. In this example, 50,000 barrels ($750,000 divided by $15), as opposed to 15,000 barrels originally, could now be reclassified. This amendment thus increased dramatically the number of barrels of oil that could be freed from price controls. At the same time it reduced the number of barrels of price-controlled crude deemed to be in production. This in turn reduced the number of monthly entitlements available to refiners.

On January 5, 1981, DOE added another category of expenses under the tertiary exemption program. These included expenditures for advanced recovery methods which were paid to "in-house" subsidiaries or affiliates. 46 Fed. Reg. 1246 (1981). In addition, DOE imposed no time limits on when tertiary projects had to actually begin. 46 Fed.Reg. 27293 (May 18, 1981). Major petroleum corporations could thus charge off "phantom" expenses paid to an affiliate for a project that might not begin for months in the future. This change also caused additional shrinkage in the number of monthly entitlements allotted.

Order does not abrogate the right that accrued to a firm to establish prices for crude oil prior to January 28, 1981. *Thus, a firm may become a qualified producer ... on or after January 28, 1981.* A qualified producer may also recover allowed expenses through the recertification of crude oil sold in the months of December 1980 and January 1981, respectively, as long as the producer has *incurred, paid,* and *reported* those expenses prior to *February 28* and *March 31, 1981.* DOE Ruling 1981–1, 46 Fed.Reg. 12947 (1981). Emphasis added.

Under this interpretation, *new* tertiary projects could be qualified *after* January 28 as long as a producer "incurred, paid and reported" its expenses prior to the February 28 or March 31 cutoff dates. Numerous producers took advantage of this extra grace period by initiating new tertiary projects and recertifying oil that had previously been sold at controlled prices.[2]

DOE's extension of the tertiary program had a dramatic impact on the entitlements program. Because of the increased number of recertifications allowed, a greater proportion of the overall petroleum production was reclassified as decontrolled rather than controlled oil during the last two months, or "mop-up" phase of price controls. Oil that would normally have been sold at cheaper controlled prices was retroactively marked-up to reflect a sale at higher market levels.

Refiners, particularly the smaller independents, were forced to subsidize those producers able to take advantage of this last-minute regulatory loophole. They were not allotted as many entitlements because there was less decontrolled oil deemed to be in production. Consequently, they had to pay a higher price for their oil purchases.

Union Oil, the plaintiff in this action, was one of those producers adversely affected by DOE's February 19th Ruling 1981–1. Union claims that this Ruling had the effect of extending the tertiary incentive program

beyond the January 28 decontrol date and should therefore be declared unlawful.

## II

## ANALYSIS

The plain language of the President's Executive Order indicates that all oil price controls, minus those expressly excepted, were to be terminated on January 28, 1981. The Order provided for the "immediate and orderly decontrol of crude oil and refined petroleum products."

DOE, however, reasons that its extension is justified because the tertiary program was an *exemption* from price controls and was therefore unaffected by the President's Order. In addition, DOE argues that the Decontrol Order did not abolish the reporting and record-keeping regulations which were part of the recertification process. DOE reasons that the continued existence of the regulations kept the tertiary program alive, despite the Decontrol Order. Finally, DOE contends that its continuation of the tertiary program was in keeping with the President's Executive Order because it encouraged additional domestic oil production. As will be shown below, these arguments are without merit.

### A. The Legislative History of the Tertiary Incentive Program

Contrary to DOE's assertion, the tertiary incentive program never was intended to enjoy a separate and independent existence apart from crude oil price controls. This is made clear by the following language which appeared in the House-Senate Conference Report submitted at the time the tertiary incentive program was initiated.

The conferees are agreed that there exists great potential for augmenting domestic crude oil production through the application of enhanced recovery techniques. [i.e. tertiary methods] There is also general agreement that current economic circumstances would permit ad-

2. By mid-March 1981, DOE acknowledged that during the period immediately following the President's Decontrol Order, "the amount of

recoupable [tertiary] expenses reported ... has increased phenomenally." 46 Fed.Reg. 17566 (March 19, 1981).

justments to the pricing mechanism contained in the Energy Policy and Conservation Act to give needed additional incentives for the application of high-cost enhancement techniques which today are not economical . . . .

For these reasons, the conference substitute seeks to obtain the objective of providing additional price incentives for high-cost enhancement techniques by equipping the Administrator with greater flexibility to provide for such incentives *within the framework of the existing price regulatory structure.*

S.Conf.Rep.No. 94–1119, 94th Cong., 2d Sess. 71 (1976), U.S.Code Cong. & Admin. News, p. 2005. Emphasis added. Senator Domenici expressed a similar perception of the tertiary program. He stated that:

[W]e can delay for 10 or 15 years the recovery of any substantial quantities of oil by the secondary or tertiary techniques . . . . [Or w]e can leave it there and wait 10 or 15 years from now, *perhaps when there are no controls, and then the expensive techniques . . . will come into play.*

122 Cong.Rec. 18479 (June 16, 1976). Emphasis added.

Even the Department of Energy endorsed such a rationale when, in 1979, it implemented one phase of the tertiary program. The Department announced that:

This action is intended to increase domestic crude oil production through the initiation of additional projects utilizing a variety of [advanced recovery] techniques in a wide range of reservoirs. *This increased level of activity, during the period of crude oil price controls,* should promote technical and commercial advances in [advanced recovery] techniques.

44 Fed.Reg. 51148–49 (Aug. 30, 1979). Emphasis added.

DOE's interpretation would allow the continued existence of a regulatory incentive program now rendered unnecessary by price decontrol. Once price controls end, the need for a system of incentives designed to counteract some of the adverse effects of those controls also ends. Under price controls, a producer had to rely on the recertification procedures to get market price revenues. Under a free market, this procedure becomes unnecessary because a producer can go directly into the market and receive the same prices.

### B. The Independent Reporting Regulations

Another of DOE's major arguments is that the Decontrol Order did not immediately suspend or revoke any price control regulations. Two of those regulations, 10 C.F.R. § 212.78 and § 212.131, gave tertiary producers a two-month grace period in which to retroactively recertify oil previously sold at controlled prices. This two month reporting period allowed producers to recertify *any* oil sales made prior to the January 28 cutoff date as long as tertiary expenses were incurred and the recertification reported within the two-month period *following* the Order. For these reasons DOE extended the final cutoff date for the tertiary incentive program to March 31, 1981. DOE further argues that this interpretation is necessary or else producers who qualified under the tertiary incentive program prior to January 28, but who did not attempt to recertify any oil sales until *after* that date would be forever foreclosed from doing so.

In reaching this conclusion, DOE has created a new post-decontrol right out of what amounts to an administrative reporting regulation. The regulations create the two-month delay period to make allowances for the administrative lag-time. They did not create the *right* to qualify for tertiary incentives. That right came from the substantive regulatory provisions themselves.

The organization and structure of the tertiary regulations makes this clear. 10 C.F.R. § 212.131(a) sets out the procedures for certifying various types of exempt crude oil within the two-month reporting period. *Other* regulations, however, contain the substantive rules on what types of petroleum production can qualify for a tertiary exemption. For instance, stripper well production has to qualify in accordance with 10 C.F.R. § 212.75(b). Tertiary incen-

tive oil is governed by 10 C.F.R. § 212.78(a) which provides in part:

> [F]irst sales of incremental crude oil *resulting from the implementation or expansion of a qualified tertiary recovery project* are not subject to the ceiling price limitations of this subpart.

10 C.F.R. § 212.78(a) (1981). Emphasis added.

■ This regulation clearly indicates that a producer must first initiate a qualified project and incur certain expenses before he or she can recertify oil sales using the two-month reporting procedure. DOE's interpretation, on the other hand, ignores this critical element. Instead, it focuses on when the *sale* of decontrolled oil occurred. According to DOE, sales made prior to January 28 can be recertified even if the tertiary expenditures were incurred after this time. This interpretation turns the intent of the regulations on their head. It also amounts to an unauthorized extension of a price control program beyond the date of the President's Decontrol Order.[3]

DOE's erroneous interpretation arises in part because of its confusion over the operation of the two-month reporting period. DOE apparently assumes that the two-month period allowed extended time for a producer *both* to recertify previous oil sales *and* to incur new expenditures. The regulations in question (10 C.F.R. §§ 212.78(a), 212.131(a)), however, clearly indicate that the two-month period pertains *only* to the recertification process. It does not govern the timing of expenditures.

In both its oral and written arguments, DOE also assumed that a termination of the tertiary program as of January 28 would foreclose producers who had qualified *prior* to that date from *ever* being able to recertify their oil sales during the ensuing two-month period. But the Decontrol Order simply put an end to price controls as of January 28. If a producer had qualified for the tertiary exemption *prior to that time* he or she could still recertify sales *after* January 28 provided that the recertification occurred within the requisite two-month reporting period. DOE, in fact, reached this very same conclusion with regard to other types of oil that were eligible for various price control exemptions. 46 Fed.Reg. 12947 (Feb. 19, 1981) (Answer # 5).

Nor can DOE successfully argue that the two-month reporting regulations somehow gave the tertiary program added life because they were unique to that program. The two-month reporting regulations were adopted independently of the tertiary incentive program and applied to all types of crude oil price control exemptions. See 10 C.F.R. §§ 212.131(a)(1)–(a)(4), 212.131(a)(6) (1981); 40 Fed.Reg. 13522–23 (1975). Thus, DOE's position that the tertiary program, and it alone, somehow survived because of these reporting regulations cannot withstand scrutiny.

DOE's position is further undermined by the plain language of the President's Executive Order. The Order stated that "[a]ll crude oil and refined petroleum products are exempted from price and allocation controls." The remainder of the Order set out three categories of petroleum that were not to be immediately affected. Tertiary incentive oil was not one of them.

### C. DOE's Argument that its Interpretation Helped Encourage Domestic Production

DOE further argues that a continuation of the tertiary incentive program beyond January 28 was in keeping with the President's Order because it further encouraged domestic production. In reality, what DOE's ruling did was to spark a last minute stampede by oil producers eager to claim benefits under what amounted to a regulatory loophole. See *The Washington Post*, March 30, 1981, Washington Business Section, at 3, col.2.

Under oil price control regulations as they existed just prior to the President's

---

**3.** Both DOE and the court in *Diamond Shamrock v. Edwards*, 510 F.Supp. 1376 (D.Del.1981) focused on whether pre-January 28th *sales* could be recertified, regardless of whether a producer had *qualified* for a tertiary exemption prior to that time.

Order, a producer could qualify for the tertiary exemption merely by classifying *prepayments* as recoupable allowable expenses. The prepayment served to satisfy the regulatory requirements even though the actual tertiary project might not begin for years in the future. See Department of Energy Interpretation No. 1981–11, 46 Fed.Reg. 27293 (May 18, 1981). In addition, certain producers could recover "phantom" tertiary expenses that were allegedly incurred in interaffiliate transactions. 46 Fed.Reg. 1246 (Jan. 5, 1981).

The result of these liberal interpretations was to allow for the recertification of tertiary oil even though actual production might not begin for years in the future. These circumstances therefore seriously undercut DOE's claim that its two-month extension encouraged domestic production. DOE even admitted as much when it expressed reservations about the two-month continuation on March 19, 1981. DOE stated that "tertiary projects which this program was designed to enhance are most likely already to have been certified and appropriate expenses incurred and paid." 46 Fed.Reg. 17566 (March 19, 1981).

By allowing recertification of new tertiary projects after January 28, 1981, DOE was allowing a select number of producers to achieve what amounted to double recovery. After January 28, with the exception of three enumerated categories, *all* oil could be sold at market prices. Therefore, a new tertiary producer was able to instantly achieve in the market place what had previously only been possible through recertification of price-controlled oil sales. But under the DOE ruling he could also claim additional revenues by recertifying other crude oil previously sold at controlled prices. Thus, a select number of producers could enjoy the best of both deregulated and regulated worlds.

On September 24, 1981, President Reagan stated in a speech to the nation that:

[W]e don't need an energy department to solve our basic energy problem. As long as we let the forces of the market place work without undue interference, the ingenuity of consumers, business, producers, and inventors will do that for us.

*Weekly Compilation of Presidential Documents*, Vol. 17, no. 39, p. 1027 (Sept. 24, 1981). While this speech did not expressly refer to Ruling 1981–1 of February 19, it clearly reflects a view fundamentally at odds with the policy rationale DOE urges here.

## III

### THE APPROPRIATE STANDARD OF REVIEW

■ This Court is required to give substantial deference to the agency's own interpretation of its regulations, as well as to the agency's interpretation of orders and statutes which confer or limit the agency's authority. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Energy Consumers & Producers Ass'n. v. DOE*, 632 F.2d 129 (Em.App.1980).

■ At the same time, however, judicial review is not a "rubber stamp." *E.g., NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). It is clear that:

[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] ... (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right ....

5 U.S.C. § 706 (1976).

"[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated .... The power of an administrative officer ... is ... only the power to adopt regulations to carry into effect the will of Congress .... A regulation which does not do this, but operates to create a rule out of harmony with the statute is a mere nullity." *United States v.*

*Larionoff,* 431 U.S. 864, 873 & n.12, 97 S.Ct. 2150, 2156 & n.12, 53 L.Ed.2d 48 (1977) (brackets omitted).

Neither the language nor intent of President Reagan's Executive Order No. 12287, the regulations, nor the history of the statute, is consistent with DOE's argument that producers could receive benefits under the Tertiary Incentive Program for new investments made after the date of decontrol. To the contrary, DOE's position contravenes the language and the intent of the President's Executive Order, the regulations, and the Congress.

This Court has carefully reviewed the decision in *Diamond Shamrock v. Edwards,* 510 F.Supp. 1376 (1981) which upheld the DOE Ruling being challenged in this case. Although this Court found the analysis in that decision helpful, it is unclear precisely what materials and arguments were before the Delaware Court with regard to the questions at issue here. In addition, *Diamond Shamrock* involved a motion for a preliminary injunction. It is well established that decisions made on motions for preliminary injunction "are not determinative of those issues" at trial on the merits. *E.g., Bursten v. Phillips,* 351 F.2d 616 (9th Cir. 1965). "Based, as they usually are, on incomplete evidence and a relatively hurried consideration of the issues, these provisional decisions should not be used outside the context in which they originally were rendered." 11 Wright & Miller, Federal Practice & Procedure § 2950, at 494–95 (1973) (footnotes omitted). For these reasons, this Court has decided not to follow the *Diamond Shamrock* decision.

The Court also wishes to make it clear that this decision has no effect on tertiary costs incurred and paid before decontrol. Producers making such investments had qualified for benefits under the Tertiary Program before it ended. The Executive Order of January 28 preserved their rights by permitting the certification or recertification of crude oil after that date. Executive Order 12287 § 2(a); 46 Fed.Reg. 12946 (Answer # 1), 12947 (Answer # 5). This conclusion is also consistent with the intent of Congress in recognizing tertiary expenses incurred and paid during the period of the price control regimen.

For the reasons set out above, plaintiff's motion for summary judgment is granted and defendants' cross motion for summary judgment is denied.