TOSCO CORPORATION, Plaintiff,

v.

DEPARTMENT OF ENERGY, and James
B. Edwards, Jr., Secretary of
Energy, Defendants.

No. CIV–R–81–99–ECR.

United States District Court,
D. Nevada.

Feb. 10, 1982.

As Amended Feb. 17, 1982.

Samuel S. Lionel, F. Harvey Whittemore, Lionel, Sawyer & Collins, Reno, Nev., and Kenneth L. Bachman, Jr., Sara D. Schotland, Eugene M. Goott and Mark Duvall, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., for plaintiff.

David Engels, Robert C. Power, Dept. of Energy, Washington, D. C., and Lamond R. Mills, U.S. Atty., Shirley Smith, Asst. U.S. Atty., Reno, Nev., for defendants.

## MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge.

Cross-motions for summary judgment are before the Court. Extensive points and authorities have been filed, and oral argument has been heard, the plaintiff being represented by attorney Kenneth L. Bachman, Jr., and the defendants by attorney Kathrine L. Henry.

The plaintiff (Tosco) is a refiner and marketer of petroleum products. However, it produces no crude oil. Its Complaint relates that defendant Department of Energy (DOE) was directed by Congress to amend its price and allocation regulations so as to provide additional price incentives for producers who would utilize tertiary enhanced recovery techniques. The objective was to increase domestic oil production by encouraging the use of engineering procedures that would not otherwise have been economically feasible at the time due to the price controls on crude oil produced in this country, according to the plaintiff.

The Complaint states that DOE adopted a Tertiary Incentive Program which, in essence, permitted a producer who incurred and paid expenses in connection with a qualified tertiary enhanced recovery project to recoup 75 percent of those expenses at once, even though the project would not be worked on until some future time. The recoupment was accomplished by permitting the producer to sell price-controlled crude oil, from any property in which it had an interest, at market price; that is, as though the oil was exempt from price controls.

If the recovery technique to be used was of a type listed by DOE, the producer self-certified its own project as qualified. If some other technique was to be utilized, DOE had to certify the project.

DOE's regulations, the Complaint continues, required a producer to certify to each purchaser of its oil, within two months after the month of sale, the price category of the oil. For example, crude oil purchased by a refiner in January at the lower price-controlled price for domestic oil could be recertified by the producer in March as tertiary incentive oil. Since tertiary incentive oil could be sold at market price, there was a substantial difference in cost to the refiner, who had to pay that difference. It amounted to a retroactive increase in price.

Under the Tertiary Incentive Program as originally promulgated, expenses paid to affiliated entities could not be recouped by the producer. To be recoupable, expenses had to have been incurred in arm's length transactions with non-related contractors. The Complaint alleges that on December 29, 1980, DOE amended the Program to allow expenses incurred and paid to affiliated entities to be recouped. DOE made the amendment effective on January 5, 1981, the date of its publication in the Federal Register, and applicable to expenses incurred and paid after December 29, 1980. As a result of the amendment, recertifications increased enormously, thereby subjecting Tosco and other refiners to substantial additional financial burdens.

The plaintiff's Complaint recites that virtually all oil was decontrolled by President Reagan's Executive Order of January 28, 1981. That Order was immediately effective. Certain DOE regulatory programs were specifically excepted (left in effect), but the Tertiary Incentive Program was not one of them. However, DOE was expressly authorized to issue entitlement notices for the period up to the date of decontrol, although the notices would actually be issued subsequent to that date.

The entitlement program had been set up in order to spread the benefit of cheaper domestic oil throughout the petroleum industry. Basically, each refiner, whether a large integrated oil company or a small independent refiner, was entitled to a proportion of the lower priced domestic oil, based upon the total amount of crude oil each refined. Rather than actually transport domestic oil from one refinery to another, the equalization process was done on paper. A refiners who had received more than its proportionate share of price-controlled domestic oil during a month had to purchase entitlements from refiners who had received less than their shares. The cost of an entitlement represented the difference between the price per barrel of price-controlled crude and that of exempt (e.g., foreign or tertiary) crude. Because of the time necessary to enable the refiners to report to DOE, the time required by DOE to ascertain the size of the entitlements right of each refiner, and the time needed by DOE to calculate the dollar and cent value of an entitlement, entitlements notices were not issued by DOE until almost two months after the end of the calendar month to which they applied.

On February 12, 1981, DOE issued its Ruling 1981–1, which, in question and answer form, explained the effect of the President's decontrol Executive Order on DOE's allocation and price regulations. The Ruling declared that a producer could qualify under the Tertiary Incentive Program subsequent to the date of the Executive Order. Further, the producer could recoup Tertiary Program expenses through recertification of an appropriate amount of its domestic oil

sold during December 1980 and January 1981, just so those expenses were incurred and paid during the months of February 1981 and March 1981, respectively.

The Complaint complains that this amounted to a continuance of the Tertiary Incentive Program for two months after decontrol of oil by the Executive Order. The combination of such continuance and the regulatory amendment permitting recoupment of Tertiary project expenses incurred and paid to an affiliated ("in-house") entity resulted in recertification nationwide, under the Tertiary Incentive Program, of 290 percent more oil in the month after decontrol compared to the prior month. Plaintiff Tosco was subjected to recertification of twelve times as much crude oil in the first month after decontrol as for the last month prior thereto. This retroactive increase in price undermined the Entitlements Program, Tosco argues, because it had the effect of changing price-controlled oil to exempt market price oil.

The prayer of the Complaint asks for a declaratory judgment that: (1) Ruling 1981–1 and the actions of DOE pursuant thereto insofar as they permit recertifications of price-controlled oil after January 27, 1981, are unlawful and void; (2) all such recertifications are unlawful and void; and (3) the January 5, 1981, affiliate amendment to the Tertiary Incentive Program was promulgated contrary to the procedure required by law, so that the amendment and all recertifications pursuant thereto are unlawful and void. In addition, the prayer asks the Court to order DOE to identify all recertifications declared invalid as a result of this legal action and to issue an Entitlements Notice to rectify their effect on prior Entitlements Notices. Finally, the prayer of the Complaint asks this Court to determine that a substantial constitutional issue exists with respect to recertifications after January 27, 1981, under Ruling 1981–1 and to certify the issue to the Temporary Emergency Court of Appeals.

The Answer of the defendants admits jurisdiction in this Court by reason of 15 U.S.C. § 754(a), which incorporates Section 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note. It admits factual allegations of the Complaint, but denies the plaintiff's conclusions derived therefrom.

*Discussion*:

This Court has jurisdiction over the subject matter of this lawsuit, as framed by the pleadings. *See Diamond Shamrock Corp. v. Edwards*, 510 F.Supp. 1376, n.1 (D.Del.1981); *People of State of California, State Lands Com'n. v. Simon*, 504 F.2d 430, n.3 (Em.App.1974); *Energy Consumers, Etc. v. Dept. of Energy*, 632 F.2d 129, 139 (Em.App.1980).

There are two separate matters at issue here. The first, chronologically, is DOE's amendment to 10 C.F.R. § 212.78, which regulation covers the Tertiary Incentive Program. From the start it defined "recoupable allowed expenses" as limited to expenses incurred in arm's length transactions. However, on August 15, 1980, DOE published in the Federal Register notice that it proposed to amend the regulation by permitting the recoupment of tertiary recovery expenses paid "in-house", that is for goods and services provided from within the producer's own firm. 45 Fed.Reg. 54688. The proposed amendment was adopted by DOE on December 29, 1980, and published as a final rule on January 5, 1981. 46 Fed.Reg. 1246. DOE made the amendment effective immediately, that is, on January 5, 1981, and applicable to expenses incurred or paid after December 29, 1980.

5 U.S.C. § 553(d), part of the Administrative Procedure Act, specifies that publication of a substantive rule shall be made not less than 30 days before its effective date, with certain exceptions. It is applicable to DOE. *Atlantic Richfield Co. v. F.E.A.*, 429 F.Supp. 1052 (N.D.Cal.1976), aff'd. 556 F.2d 542 (Em.App.1977). DOE claimed that its "in-house" amendment fell within two of those exceptions; namely, the one for a substantive rule which relieves a restriction and the one for "good cause".

■ By claiming that it came within those exceptions to the statutory mandate,

DOE acknowledged that its amendment was substantive. The exception for rules that relieve restrictions refers only to substantive rules. 5 U.S.C. § 553(d)(1). A rule change concerning interaffiliate transfers of natural gas liquids also was treated as substantive in *Amoco Production Co. v. Department of Energy*, 512 F.Supp. 815 (D.Del.1981).

The justification for the "in-house" amendment, according to DOE, was that goods and services obtained from an affiliate should cost the producer less. Therefore, more efficient use of resources for Tertiary recovery projects would be accomplished.

The "good cause" exception to the 30-day waiting period, 5 U.S.C. § 553(d)(3), was invoked by DOE on the ground that it was in the public interest for the amendment to be made effective immediately. The combination of "economic efficiency and the lack of countervailing injury to others" was deemed to show that "the public interest favored—and thus good cause existed—to make the amendment effective immediately". (The quotations are from page 35 of the defendants' memorandum of points and authorities filed herein September 23, 1981.)

Plaintiff Tosco has vigorously denounced DOE's circumvention of the 30-day waiting requirement. Tosco alleges that the effect of the amendment was not merely to relieve a restriction on the producers, but rather, it enabled the producers to shift to refiners 75 percent of the cost of the producers' Tertiary recovery projects. This result was made possible, according to Tosco, because it was no longer necessary for the producers to actually pay those costs to an outside contractor before being allowed to recoup 75 percent of them from its refinery customers. After the amendment, a producer need only shift money from its left affiliate pocket to its right affiliate pocket in order to be able to claim the right to recoup.

■ The 30-day waiting period allows for scrutiny of the proposed rule by interested parties and their participation in the rule-making process. This serves to reduce the risk of factual errors, arbitrary actions and unforeseen detrimental consequences. *Chamber of Commerce of United States v. O.S.H.A.*, 636 F.2d 464 (D.C. Cir. 1980). "Charting changes in policy direction with the aid of those who will be affected by the shift in course helps dispel suspicions of agency predisposition, unfairness, arrogance, improper influence, and ulterior motivation." *Id.*, at 470. As a matter of sound policy, procedural safeguards that assure the public access to the decisionmaker should be vigorously enforced. *Western Oil & Gas v. United States E.P.A.*, 633 F.2d 803 (9th Cir. 1980).

■ DOE has recognized that the relieving of a restriction exception to the 30-day wait requirement is not applicable where additional burdens would be imposed on affected firms by the amendment to a rule. 45 Fed.Reg. 40106, 40107 (June 13, 1980). The change from a ban on recoupment of "in-house" payments to allowance of the same was a 180 degree reversal by DOE in its treatment of the subject. Such a radical departure requires prior opportunity for meaningful comment before the change takes effect. *See Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1062–1063 (Em.App.1978).

■ The burden is on the agency to show the "good cause" that will justify its avoidance of the requirements of 5 U.S.C. § 553. *Western Oil & Gas v. United States E.P.A., supra.* The mere urgency of the problem to be remedied does not constitute such justification. *Id.* In this case, the notice of the proposed amendment was issued by DOE in early August 1980, so that there would have been time to comply with the 30-day wait requirement and still have the amendment take effect by January 5, 1981 (the date DOE made it effective). *See Consumers Union of United States, Inc. v. Sawhill*, 393 F.Supp. 639, 641 (D.C.D.C.1975), aff'd sub nom, *Consumers Union of United States, Inc. v. Zarb*, 523 F.2d 1404 (Em.App.1975); *Kelly v. United States Department of Interior*, 339 F.Supp. 1095, 1101 (E.D.Cal.1972).

■ The Court finds that DOE has failed to sustain its burden of showing that its making the "in-house" expenses amendment effective immediately upon publication of the final rule was justified under an exception to the 30-day wait required by 5 U.S.C. § 553(d). The Court holds that said action was unlawful as being done without observance of procedure required by law. 5 U.S.C. § 706(2)(D); *see also* § 211(d)(1) of 12 U.S.C. § 1904 note.

The second matter at issue is the validity of DOE's Ruling 1981–1, published at 46 Fed.Reg. 12945 (February 19, 1981). Answer # 2 (the Ruling is in question and answer form) stated that DOE would publish in February 1981 an entitlements notice covering crude oil received at refineries during the month of December 1980, and also would publish in March 1981 an entitlements notice for crude oil received at refineries between January 1, 1981, and January 27, 1981, both dates inclusive. (The President's Executive Order 12287 decontrolling crude oil and refined petroleum products was effective January 28, 1981, the date of its issuance. 46 Fed.Reg. 9909 (January 30, 1981)).

Answer # 4 of Ruling 1981–1 declared that petroleum price regulations would not affect sales made after 12:01 a.m., January 28, 1981.

Answer # 5 asserted that crude oil sold during the months of December 1980 and January 1981, which would have qualified for recertification in the absence of the Executive Order, could still be recertified (from the price-controlled price to market price) as Tertiary Incentive Program oil. However, the recertification would have to be made within the two-month period immediately following the month in which the sale was made. This was consistent with existing 10 C.F.R. § 212.131(a)(6). Accordingly, a producer could not recertify after March 1981.

Answer # 6 averred that a producer who had sold price-controlled crude oil prior to January 28, 1981, and who could lawfully recertify it pursuant to 10 C.F.R. 212.131(a)(6) would be permitted to do so.

Answer # 7 is the focal point of the instant cross-motions for summary judgment as to Ruling 1981–1. It correctly stated that, absent the Executive Order, a producer who incurred and paid Tertiary recovery expenses prior to February 28, 1981, and March 31, 1981, could have recouped those expenses through the recertification of crude oil it had sold in the months of December 1980 and January 1981, respectively. The controversial part of the answer then took the position that although the Executive Order was intended to provide for immediate decontrol of crude oil, it was not meant to abrogate a producer's right to recertify oil it had sold prior to the date of that Order. Thus, Answer # 7 concluded, a firm could qualify under the Tertiary Incentive Program after January 28, 1981, and then recertify oil it had sold during December 1980 and January 1981, so long as the Tertiary expenses were incurred, paid and reported prior to February 28, 1981, and March 31, 1981, respectively.

Tosco contends that Ruling 1981–1 is substantive (legislative) and should be held invalid because it wasn't promulgated in compliance with the procedural requirements of the Administrative Procedure Act. Those requirements deal with notice, opportunity for interested parties to make known their views, and the aforementioned 30-day waiting period before a new rule becomes effective.

The Act specifically excepts interpretative (as contrasted to substantive) rules from the procedural requirements. 5 U.S.C. § 553. DOE stoutly maintains that Ruling 1981–1 was merely an interpretative explanation of the effect of the Executive Order on its existing regulations and rules. While DOE's characterization of its own ruling is not controlling, it is entitled to some judicial deference. *Energy Reserves Group, Inc., v. Department of Energy,* 589 F.2d 1082 (Em.App.1978). Nevertheless, it is what the agency purported to do and has done that is decisive. *Chamber of Commerce of United States v. O.S.H.A.,* 636 F.2d 464 (D.C. Cir. 1980); *Standard Oil Co. v. Department of Energy,* 596 F.2d 1029 (Em.App.1978).

■ An explanation of existing regulations is an interpretative rule. *Continental Oil Company v. Burns*, 317 F.Supp. 194 (D.Del.1970). The U.S. Supreme Court has taken into consideration whether the contested ruling is in conflict with earlier pronouncements of the same agency. *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). I find that Ruling 1981–1 is consistent with DOE's prior position as to the relationship of the Tertiary Incentives Program with the entitlements program. Therefore, it is an interpretative rule and not invalid for failure to comply with procedural requirements. Chief Judge Latchum, of the District of Delaware, has reached the same conclusion. *Diamond Shamrock Corporation v. Edwards*, 510 F.Supp. 1376 (D.Del.1981).

Section 211(d)(1) of 12 U.S.C. § 1904 note incorporates the standards of 5 U.S.C. § 706 in determining the validity of DOE's Ruling. *See Texaco, Inc. v. Federal Energy Administration*, 531 F.2d 1071 (Em.App. 1976). In addition to the procedural requirements discussed above, Tosco argues that Ruling 1981–1 violates § 706 in that the Ruling was not in accordance with law, was promulgated in excess of DOE's authority, and was arbitrary and capricious.

■ In considering a challenge to an interpretative rule, a court has the power to substitute its own judgment for that of the agency on questions of the legislative scheme and statutory interpretation. *Energy Reserves Group, Inc., v. Department of Energy, supra; Diamond Shamrock Corporation v. Edwards, supra.* The weight to be given to the agency's interpretation depends upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and those other factors which are persuasive. *UPG, Inc., v. Edwards*, 647 F.2d 147 (Em.App.1981); *Standard Oil Co. v. Department of Energy, supra; General Electric Co. v. Gilbert, supra.*

■ Judge Hatter, of the Central District of California, has held that DOE's position, that producers could receive benefits under the Tertiary Incentive Program for new investments made after the date of decontrol, contravened the language and intent of the Executive Order, the existing regulations and legislative history. *Union Oil Company of California v. United States Department of Energy*, 530 F.Supp. 717, (C.D. Cal. 1982). He points out that the Tertiary program was not meant to exist separate and apart from crude oil price controls. The disincentive of price controls is what caused expensive tertiary recovery programs to be economically unfeasible. When price controls ended, with the Executive Order, the need for special treatment in order to obtain market prices also ended, the Judge maintains.

The logic of Judge Hatter's reasoning, as far as it goes, is unassailable. However, DOE feels that it doesn't go far enough. Pursuant to Congressional directive in 15 U.S.C. § 757(j)(1)(A), on July 26, 1978, DOE issued a regulation, 10 C.F.R. 212.78, which exempted increased oil production developed by Tertiary recovery methods from price controls; i.e., market price could be charged for the extra crude oil so produced. The results were disappointing. Apparently oil producers were unwilling to invest in risky Tertiary recovery projects solely on the basis of a hope that some years down the road the investment might become profitable by reason of obtaining market price for any extra oil recovered.

Therefore, on August 21, 1979, DOE amended 20 C.F.R. 212.78, 44 Fed.Reg. 51148 (August 30, 1979), by allowing producers who incurred and paid expenses in connection with a Tertiary project to recoup 75 percent of those expenses "up front" by charging market prices for otherwise price-controlled crude oil. The producer no longer had to wait until increased, Tertiary, production was obtained. Recoupment was permitted from the sale of other crude so soon as the Tertiary recovery financial obligation had been incurred and paid. It mattered not that the actual physical work on the Tertiary project might not commence until years in the future. It mattered not that the Tertiary project, when finally completed, might prove to be unsuccessful, so

that little or no extra production actually would result. These are the factors for which simple price decontrol did not compensate.

Judge Hatter, in the *Union Oil* opinion, further finds Ruling 1981-1 invalid in that it permitted a producer to recoup Tertiary expenses not incurred and paid until after the decontrol Executive Order. He feels that the right to qualify for Tertiary incentives did not survive President Reagan's January 28, 1981 Order. Only producers who had qualified prior to that date should be allowed to recertify (retroactively raise the price of) oil sold during the months of December 1980 and January 1981. The two-month lag time after month of sale provided by 10 C.F.R. 212.131(a)(6) for recertification did not encompass the timing of expenditures, in Judge Hatter's view.

On the other hand, Chief Judge Latchum, in *Diamond Shamrock Corporation v. Edwards*, 510 F.Supp. 1376, 1389 (D.Del.1981), found DOE's position on this issue to be "probably correct". Because the case before him involved a request for preliminary injunctive relief, he considered in some detail the question of which side would probably prevail on the merits. He held Ruling 1981-1 to be an interpretative rule which had no impact at all upon the plaintiff refiners by its own force. The impact upon them was by virtue of existing regulations. The opinion notes that the Executive Order specifically authorized DOE to "adopt such regulations and take such actions as he (the Secretary of Energy) deems necessary to implement this Order." Therefore, the plaintiffs had to show that the Ruling adopted an erroneous interpretation of the effect of the Executive Order on the regulations covering the entitlements program and the Tertiary Incentive Program.

A provision of the Executive Order specified that DOE could adopt regulations and take actions to promulgate entitlements notices for periods prior to the Order and also to establish a mechanism for entitlements adjustments for periods prior to the Order. Judge Latchum rejected the argument that this allowed merely the establishment of a mechanism to correct for errors in prior months. He feels that the Order "can only contemplate the regular promulgation of notices for crude oil purchases which took place in December and January." 510 F.Supp. at 1389. His opinion declares that DOE's long-standing interpretation of the entitlements program, which interpretation was developed outside the context of litigation, would necessitate the promulgation of entitlements notices two months after the program ended. He also suggested that in the absence of such entitlements, refiners who had purchased large quantities of price-controlled oil in December 1980 and January 1981 would receive a disproportionate windfall when they sold their refined products at decontrolled (market) prices.

As to the effect of the Executive Order on the Tertiary Incentive Program, the *Diamond Shamrock* opinion reiterates that the Order had no effect upon sales made prior to January 28, 1981. Judge Latchum continues, at page 1390:

> "Moreover, it did not revoke any validly promulgated regulations but instead, directed DOE to 'take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order.' Thus, the regulations allowing retroactive price increases in order to recoup certain expenses are still in force and because the President's Order did not apply to the oil sales before January 28, 1981, those still valid regulations would work to allow retroactive price increases."

Judge Latchum also points out that many of the projects which used the retroactive price increase were probably planned before the Executive Order, "... and the use of retroactive price increases to provide front end money was probably a material consideration in the planning." *Ibid.* In the case before me, my holding that the "in-house" expense amendment is invalid inadvertently lessens the chance for abuse of Ruling 1981-1. The Ruling's consistency with the long-standing position of DOE reinforces my finding that it is reasonable. *See General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

694

The allegation that the Ruling is arbitrary and capricious is rejected by my finding that it was based on a consideration of the relevant factors, that there was no clear error of judgment, and that DOE has demonstrated a rational connection between the facts and the choice it made. *See Mobil Oil v. Dept. of Energy*, 610 F.2d 796 (Em.App. 1979). The fact that the Ruling may have a substantial impact on Tosco and other refiners does not reflect inconsistency with the underlying law. *See Energy Reserves Group, Inc., v. Department of Energy*, 589 F.2d 1082, 1108 (Em.App.1978). Refiners do not have any legal right to exclusive enjoyment, at the expense of producers, of the economic benefits of the petroleum price and allocation controls. *See Atlantic Richfield Company v. United States Department of Energy*, 655 F.2d 1118 (Em. App.1981). After all, the producers bore the brunt of the control programs in that they were required to sell significant quantities of the oil they produced at below market prices.

It is the Court's conclusion that there is no genuine issue as to any material fact and that the moving parties are respectively entitled to judgment as a matter of law on the issues of the validity of the "in-house" expenses amendment and Ruling 1981–1, as above discussed. Accordingly, an order on the cross-motions for summary judgment shall be issued simultaneously herewith.

Nevertheless, the constitutional questions raised do have merit and neither the Temporary Emergency Court of Appeals nor the United States Supreme Court has rendered decisions foreclosing the issues, therefore I shall certify the issues as to the validity of said amendment and said Ruling to the Temporary Emergency Court of Appeals, pursuant to Section 211(c) of 12 U.S.C. § 1904 note.